## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

      v.

WILLIAM MCBETH

    Defendant.

No. 21 CR 21
Hon. Franklin U. Valderrama

## DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE REPORT

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

DEFENDANT'S SENTENCING MEMORANDUM ..................................................... 1

I.    OVERVIEW OF SENTENCING REQUEST ................................................. 1

II.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE JUSTIFY A 100 MONTH SENTENCE ................................................................................. 1

    A.  These offenses occurred nearly nine years ago, and William is a different person than he was in 2015 .................................................... 1

    B.  Due to the delay in the indictment, William lost the opportunity to cooperate ........................................................................................ 3

III.    IN CONSIDERING THE 18 U.S.C. §3553(a) FACTORS, INCLUDING WILLIAM'S PERSONAL HISTORY AND CHARACTERISTICS, A SENTENCE OF 100 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT ........................................... 3

    A.  William's personal history and characteristics justify the requested sentence of 100 months ............................................................... 4

        1.  William was raised by a strict paternal aunt after his father died from a combination of drug addiction and HIV, and his mother died of an undisclosed illness ........................................................ 4

        2.  William has lost numerous friends and family members to street violence ............................................................................. 9

        3.  William is devoted to his children, who love him and need him in their lives .................................................................................. 12

    B.  William has plans for the future ................................................... 14

IV.    THE REQUESTED SENTENCE AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS A JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, AND PROTECTS THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT ................................................................................. 15

V.    THE CALCULATED CRIMINAL HISTORY CATEGORY OVERSTATES THE SERIOUSNESS OF WILLIAM'S BACKGROUND ................................... 18

VI.    CORRECTIONS AND OBJECTIONS TO THE PRESENTENCE REPORT ....... 19

    A.  CORRECTIONS TO THE PRESENTENCE REPORT ............................. 19

**1. Paragraph #8** ........................................................................ 20

**2. Paragraph # 11** .................................................................... 20

**B. OBJECTIONS TO THE GUIDELINE CALCULATION** ........................ 20

**1. Objection to § 2G1.3(b)(2)(B) unduly influence minor to engage in prohibited sexual conduct** ........................................... 20

**2. Objection to § 2G1.3(b)(3)(B) use of computer** ................... 22

**3. Objection to 5 point increase under § 4B1.5(b)(1)** ............... 23

**C. OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE** .............. 25

**VII. CONCLUSION** .......................................................................... 26

# TABLE OF AUTHORITIES

## CASELAW

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................... 2-4

*Koon v. United States,* 518 U.S. 81 (1998) .................................................................... 4

*Pepper v. United States,* 562 U.S. 476 (2011) .............................................................. 3

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................... 1

*United States v. Calvo,* 596 Fed.Appx. 541 (9th Cir. 2015) ..................................... 21-22

*United States v. Hines*, 449 F.3d 808 (7th Cir. 2006) ................................................. 23

*United States v. Jimenez*, 2022 WL 1015396 (S.D. Fla. Apr. 4, 2022) ...................... 24

*United States v. Myers*, 481 F.3d 1107 (8th Cir. 2007) .............................................. 22

*United States v. Nichols*, 740 F.Supp.1332 (N.D. Ill. 1990) ................................... 18-19

*United States v. Osborne*, 17CR73 (N.D. Ill. Sept. 30, 2019) ................................... 25

*United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011) ........................................ 18

*United States v. Wooden*, 595 U.S. 360 (2022) ..................................................... 24-25

## STATUTES

18 U.S.C § 3553 ..................................................................................................... *passim*

U.S.S.G. § 2G1.3 ................................................................................................... 20-22

U.S.S.G. § 4B1.5 ................................................................................................... 23-25

## OTHER AUTHORITIES

*Chicago Police Release April 2022 Crime report,* ABC7 Chicago (May 1, 2022) .................... 11

James M. Bolton, et. al*., Consequences of Sibling Death: Problematic, Potentially Predictable, and Poorly Managed,* 171 JAMA Pediatrics 519, 520 (2017) .................................... 11

Grant Hillary Brenner, *How Losing a Parent Affects Young Children,* Psychology Today, (Feb. 22, 2022) ................................................................................................................... 5

Deborah Rivas-Drake, *When Bullying is Racially Motivated: Recognizing It for What It Is and Supporting Kids to be Anti-Racist Upstanders,* Committee for Children, (Nov. 2, 2020) ............ 8

Phyllis S. Komensky & John R. Jordan, Attachment Informed Grief Therapy: The Clinician's Guide to Foundations and Applications 89 (2016) ...................................................... 11

Ebony Underwood & Miriam Aroni Krinsky, *Millions of Children Lost Their Parents To Incarceration. That Doesn't Have To Happen*, The Appeal, (Oct. 24, 2019) ............................ 13

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant William McBeth, by his attorney, Bedi & Singer, LLP, respectfully requests, pursuant to 18 U.S.C § 3553(a), *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, that this Court impose a sentence of 100 months, followed by a term of supervised release. In support of this request, William states as follows:

### I. OVERVIEW OF SENTENCING REQUEST

William is a 39-year-old father of three children with whom he has a great relationship and whom he supports emotionally and financially. (PSR, ¶118). These charges occurred almost nine years ago when William was a different person than he is now. His voluntary withdrawal from this criminal activity, desire to raise his children and provide them with the paternal role model he never had, to stay sober, and to be a productive member of society are why the requested sentence is appropriate.

### II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE JUSTIFY A 100 MONTH SENTENCE

On April 4, 2024, William pled guilty to Counts One and Two of the indictment. These are extremely serious crimes, and the extent of the offense conduct has been accurately set forth in the PSR and the Government's version of the offense. However, the charges, in and of themselves, do not tell the whole story.

#### A. These offenses occurred nearly nine years ago, and William is a different person than he was in 2015

William makes no excuses for these charges. He is profoundly humiliated and deeply remorseful as he stands before this Court. He offers one indisputable fact in mitigation: The activity underlying these charges occurred almost nine years ago. Besides traffic offenses and a misdemeanor conviction in 2018, William has had no contact with the police or criminal justice system since the charges in this case. (PSR, ¶¶73-76, ¶¶97-102). He is, quite simply, a transformed

1

man. Before his arrest in this case, William had already withdrawn the criminal activity that led to these charges. Courts have consistently taken into account the mitigating impact that voluntary withdrawal from criminal activity has when crafting appropriate sentences, and this court should do the same here. *Gall v. United States*, 552 U.S. 38, 50 (2007).

At the time of these offenses, drugs had taken over William's life. He had lost perspective and any sense of morality. William did not use the proceeds from this case to buy cars, a house, clothes, shoes, or even food. (Ex. 1). He used the funds to buy drugs. (Ex. 1). His need for drugs guided his actions, and the illegal activity he participated in was the way he saw to obtain these drugs.

When William describes this time in his life, he talks about being high on cocaine or ecstasy 17 or 18 hours a day. (Ex. 1). Then, his body would "just give out" from exhaustion. (Ex. 1). When he awakened, he sought out more drugs, and the cycle repeated itself. (Ex. 1). In William's words, "[t]he day follows the drugs." (Ex. 1). For William, drugs were a way to "escape the problems." (Ex. 1). If he felt pain and got high, "the pain would go away." (Ex. 1). Drugs took away all of his pain, physical and emotional. He says, "I could break my arm, and there would be no pain. You could break your leg, be in a cast, and walk miles, even injuring your leg more, all without pain." (Ex. 1). The effect of the drugs was extraordinary.

William describes this addiction in detail, stating, "[a]t one point I felt the drugs were good for me…put me in my own world. [Drugs] made me feel more comfortable…when I was on drugs I didn't have no problems." (PSR, ¶142). However, when William learned that his significant other, Lakiesha, was expecting a baby, he gave up drugs. (PSR, ¶143). Due to his daughter Nala's impending birth, William "had to get it right for [Nala] before she came into the world." (PSR, ¶143). William quit drugs cold turkey and had no more need for illicit funds. (Ex.

2

1). He then stopped any involvement in the unlawful acts that led to these charges, years before his arrest in this case.

William knows that he should have sought help for his narcotics addiction, but at the time, he believed there was no way out. (Ex. 1). He now understands that he was wrong and that there is always a way out. (Ex. 1). William knows he should never have become involved in these illicit acts to make money. He eventually found his way from drug addiction to recovery, before being arrested in this case. (Ex. 1). William does not offer this as an excuse for his behavior but rather as an explanation for these charges.

**B. Due to the delay in the indictment, William lost the opportunity to cooperate**

While the conduct comprising these charges took place in 2015, William was not indicted in this case until February 18, 2021, more than 5 years after the conduct took place. As discussed above, in those five years William completely cut off all conduct with the criminal activity he previously participated in and turned his life around. Therefore, William lost all contact with the individuals who continued to participate in this activity. Upon his arrest and indictment, had no ability to assist the government or cooperate in deterring future crime. William lost the ability to gain any benefit at sentencing due to the government's delay in indicting him. The court should consider this when determining an appropriate sentence.

**III.  IN CONSIDERING THE 18 U.S.C. §3553(a) FACTORS, INCLUDING WILLIAM'S PERSONAL HISTORY AND CHARACTERISTICS, A SENTENCE OF 100 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT**

The United States Supreme Court has determined a defendant's history and characteristics are "clearly relevant to the selection of the appropriate sentence," and each sentence must "fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 488 (2011). The sentencing court must "make an individualized assessment based on the facts

3

presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). *Koon v. United States*, 518 U.S. 81, 113 (1998) (The sentencing judge "consider[s] every convicted person an individual and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."). In considering all the §3553(a) factors, this Court will gain a fuller and more precise picture of William, showing a sentence of 100 months is appropriate.

### A. William's personal history and characteristics justify the requested sentence of 100 months

William experienced a challenging and unstable upbringing after he lost both of his parents at five, was separated from his siblings, and was raised by a paternal aunt who was a strict disciplinarian. Despite his learning disability, she regularly beat him when he was unable to learn simple concepts or how to spell new words. He was bullied at home and at school. At 15, he ran away from home, never to return. Yet, despite having no family support and living on the streets, he still managed to earn his high school diploma.

#### 1. William was raised by a strict paternal aunt after his father died from a combination of drug addiction and HIV, and his mother died of an undisclosed illness

William has a vague memory of his parents and of growing up in the Uptown neighborhood of Chicago. (PSR, ¶107). However, he lost both of his parents at approximately the same time, when William was just five years old. (PSR, ¶106). His father died from drug use and HIV. (PSR, ¶106). His mother passed away around the same time from an undisclosed illness. (PSR, ¶106). William is not sure which parent he lost first. Thus, he was raised by his paternal aunt, Alice McBeth, on the west side of Chicago.[1] (PSR, ¶109).

Even now, William recalls how "confused" he was when his parents died. (PSR, ¶107 ). He remembers having so many questions about his mother and father. (Ex. 1). He kept asking

---

[1] Because his Aunt Alice is the only maternal figure he has ever known, he refers to her as his "mother." (PSR, ¶ 109).

where his parents had gone, but no one would give him any answers. (Ex. 1). It seemed to him

that one day, they were there, and the next day, they were not. (Ex. 1). In William's view, his

parents had just "abandoned [him]" and disappeared into thin air. (Ex. 1). William recalls that he

felt "confused" and "that they had just left me." (PSR, ¶106; Ex. 1). No one told William until he

was much older that his parents did not desert him, they had died. (Ex. 1). The loss of his parents

rocked William to his core and totally upended his world. William remembers feeling "alone in

the world" without love or support, so he largely kept to himself. (Ex. 1). Their deaths also

marked the end of his parental role models.

      Studies reflect that it is not uncommon to feel abandoned by parental loss. An in-depth

analysis of adults who were, on average, 16 at the time of their parent's death revealed some of

the long-term effects of this loss.[2] "While each participant reported a unique process stemming

from loss, common themes included 'denial and disbelief, anger, anxiety, depression, guilt and

devastation.' Such experiences were typical and reflective not just of Kubler-Ross's classic

stages of grief - denial, anger, bargaining, depression, and acceptance - but also of the unique

quality of the 'world ending' feeling accompanying early parental loss."[3] While the participants

in this study were undeniably older than William at the time he lost his parents, one can only

imagine how much more crushing the loss was to a five-year-old. Moreover, this study only

considers those individuals who lost one parent, not two parents. William lost both of his parents

so close in time that he does not even know which parent died first.

      When William's parents died, he was also separated from his siblings, as they went to

live with his mother's family. (Ex. 1). William and his sister were left to live with his paternal

aunt and grandmother, who shared the same house. (PSR, ¶109). The maternal side of the family

---

[2] Grant Hillary Brenner, *How Losing a Parent Affects Young Children,* Psychology Today, (Feb. 22, 2022),
https://www.psychologytoday.com/us/blog/experiments/202202/how-losing-parent-affects-young-children
[3] *Id.*

played no part in raising William. (Ex. 1).

William recalled that for a while, living with his aunt was "ok." (PSR, ¶110). At first, he and his sister shared a room, which he did not mind. (Ex. 1). But his life quickly deteriorated at home and school. His aunt was extraordinarily strict, and she demanded academic perfection from William. (PSR, ¶110). Willam tried so hard to please her, but he had a learning disability and often struggled in his classes. (Ex. 1). He says, "[s]ometimes I could not get stuff" when his aunt would quiz him. (Ex. 1). He says, "[s]ome words I could not spell, and she would get mad and whup me." (Ex. 1). No matter how hard he tried, sometimes he would "just go blank." (Ex. 1). His aunt had no patience for what she perceived as William's laziness. (Ex. 1). Discipline was his aunt's sole response to his learning disability. (Ex. 1). Because of their relationship, he could not discuss the academic or social issues he confronted at school. (Ex. 1).

William's only relief came from playing music in church. (Ex. 1). There, he felt appreciated, and a male Pastor would give him a couple of dollars when he played. (Ex. 1). The Pastor would advise him as William had no paternal role models. (PSR, ¶111). During his younger years, William attended church regularly. (Ex. 1). He still remains in touch with the Pastor from his church, who writes that "he has always treated me with kindness, dignity, and respect." (Ex. 2).

William always felt different from his classmates. He was in special education classes, which isolated him from his peers. (Ex. 1). He remembers how awful the other students could be. They would make comments like "Only slow kids go to LD classes." (Ex. 1). He was also made fun of because he never had the right clothes. (Ex. 1). His aunt never bought him anything new. (PSR, ¶110). He felt "apart" from the other kids because his old clothes and worn-out shoes were "not the fashionable stuff." (Ex. 1). William believes that his aunt could have afforded to buy

6

him new clothes but she "just wasn't into buying stuff like other kids' parents." (PSR, ¶110).

Worst of all, however, was being bullied because of his skin tone. William recalls kids spoke cruelly about him because, as a light-skinned Black student, his skin tone set him apart and, in his words, made him "look different." (Ex. 1). Students in his all-Black school bullied him and called him "White boy." (Ex. 1). William's father was Black, and his mother was White. It was hard enough that William had lost his parents, but to have them disrespected by his classmates made him feel even worse. Not having his parents around always made him feel "left out." (Ex. 1). These verbal confrontations sometimes lead to physical altercations. (Ex. 1).

Yet, his sadness was further exacerbated when his classmates insulted his aunt. (PSR, ¶109). His aunt is a dark-skinned Black woman and because of the difference in skin tone between William and his aunt, other kids taunted him. (Ex. 1). They would make hurtful "jokes" and nasty comments that she could not be his mother because he was light-complected and his "mother" was dark-skinned. (Ex. 1). Kids would say, "That's not your mother." (Ex. 1). The viciousness and relentlessness of these words shattered William and made it distressing for William to attend school.

Research bears out the devastating effect of William's challenges at school due to the bullying he encountered on a day-to-day basis. "For children of color, these experiences are far too common. And given the amount of time youth spend in school, school is where they'll often encounter racial bullying. It's important to note that Black children, in particular, bear the disproportionate burden of racially-motivated peer harassment in school. … in the 2015 - 2016 school year, Black children comprised about 15 percent of the U.S. public school population but 35.5 percent of those who reported being harassed or bullied on the basis of race, color, or

national origin."[4] William often felt excluded by his peers because his parents were gone and his aunt was raising him. Being the butt of jokes because of his skin color only further alienated him.

His school teachers were not supportive either. (Ex. 1). When he was in grammar school, he was often "hit with a paddle" for what he describes as "regular stuff like acting out." (Ex. 1). He would be struck on the hand or "on the behind." (Ex. 1). This would occur at least three times a week and sometimes, daily. (Ex. 1). Researchers have concluded "[e]vidence shows corporal punishment increases children's behavioral problems over time and has no positive outcomes."[5] His aunt was aware of the corporal punishment he received at school but did not do anything about it. (Ex. 1).

William also combatted health issues as a child, which caused his peers to further ostracize him. He had an abscess on his neck when he was about five years old, which was treated and then recurred when he was in eighth grade. (Ex. 1). The abscess was big and painful. Worst of all, kids were talking about it and about him. (Ex. 1). He tolerated the discomfort of the abscess for about a month before receiving medical treatment. (Ex. 1).

Around the same time, when William was about 12 or 13, he became depressed, and experienced suicidal ideation, as he felt as if he "didn't fit in." (PSR, ¶129). He recalls, "I just coped with it" and used controlled substances to self-medicate. (PSR, ¶129). While he did not seek treatment for his mental health issues, he "got better" in his early 30s. (PSR, ¶129). However, these issues have never entirely gone away. (PSR, ¶129).

When William was 15, in expectation of a bad report card and his aunt's subsequent beating, he ran away from home, never to return. (PSR, ¶112). William had grown weary of the

---

[4] Deborah Rivas-Drake, *When Bullying is Racially Motivated: Recognizing It for What It Is and Supporting Kids to be Anti-Racist Upstanders,* Committee for Children, (Nov. 2, 2020) https://www.cfchildren.org/blog/2020/11/when-bullying-is-racially-motivated-recognizing-it-for-what-it-is-and-supporting-kids-to-be-anti-racist-upstanders/
[5] *Id.*

belittling at home and the bullying in school; quite simply, he had had enough. (Ex. 1). Between home and school, William felt he was "on punishment all the time." (Ex. 1). After just two years of high school, William "grabbed some stuff and left" the only home he had known since his parents passed. (Ex. 1).

William did not have a well-thought-out plan, so he "bounced around." (PSR, ¶112). Sometimes, he would sleep at a friend's place. (PSR, ¶112). At other times, he would stay at his sister's. (PSR, ¶112). But he often just had to sleep in the streets. (PSR, ¶112).

William recalls this as a terrible time in his life. (Ex. 1). He had thoughts of suicide as "nothing was going right." (Ex. 1). He was in the streets for about two years, trying to stay alive and make money. (Ex. 1). He started using drugs and then selling them. (PSR, ¶142). Eventually, William was arrested for selling drugs, and his sister bailed him out.

William decided it was time to turn his life around. He re-enrolled in school and earned his diploma from Howard Alternative High School. (PSR, ¶148). William had a troubling and chaotic childhood, yet he showed grit. Despite the trauma he experienced, he did not give up. For a time, he managed to turn his life around. He earned his high school diploma, stopped selling drugs, and started selling cars. (Ex. 1). William has a close relationship with his family now, he speaks to his sister, Lynn, every other day and to his brother, Clarence, every other week. (PSR, ¶114). Despite having a precarious relationship with his Aunt Alice while he was growing up, they have resolved their differences. (PSR, ¶114). William's unstable childhood, the dedication he has shown in achieving stability despite his upbringing, and the family support he now has reflect that 100 months is the appropriate sentence.

> ## 2. William has lost numerous friends and family members to street violence

William faced violence within his home and at school, and the situation was even more

dire in his neighborhood. William was raised on the west side of Chicago, in the Austin neighborhood, where he confronted violence every day. (PSR, ¶109). He lost so many people to violence that he cannot even remember all of their names. One of William's first memories of neighborhood violence occurred when he was just ten years old. (PSR, ¶109). He vividly remembers taking out the garbage one afternoon when he saw a man running down the alley, with a second man running behind the first, shooting at him. (PSR, ¶109). The second man shot the first man two or three times in the back. (Ex. 1). The first man fell to the ground, and the second ran away. (Ex. 1). William just watched as this individual bled out into the snow, and William could do nothing to help him. (Ex. 1).

When William was 12, he saw "Christopher," a person he knew from the neighborhood murdered. (Ex. 1). Christopher was shot in a driveby at Division and Laramie. (Ex. 1). Christopher was standing on the corner minding his own business when a car pulled up and shot him for no apparent reason. (Ex. 1). William's memory of that day is seeing Christopher's feet sticking out from under the white sheet as paramedics carried him away. (Ex. 1). Around that same time, a classmate was murdered by gunfire. (Ex. 1). William does not remember his name. (Ex. 1). The classmate was about the same age as William, 12-years-old. (Ex. 1).

William also recalls when he was around 12 seeing his uncle beat his girlfriend with a hammer. (Ex. 1). William recalls that his uncle was "beating her so bad." (Ex. 1). William was terrified and could not stop his uncle. (Ex. 1). He tried to awaken his mother, but the images of this beating have still stayed with William. (Ex. 1). The following year, at 13, William was robbed at gunpoint. (Ex. 1).

In April 2022, a month in which 49 people were murdered in Chicago, William lost his

friend, Craig Moore.[6] William was in custody at the time, and he received an email from his

sister telling him of Craig's murder. (Ex. 1). Craig was sitting in a car, and someone ran up to

him and shot him. (Ex. 1). Craig was at first able to drive but then lost control of his car and

crashed. (Ex. 1). He had a few surgeries, but doctors were unable to stop the bleeding, and Craig

passed away. (Ex. 1). William was heartbroken. When he read his sister's email, William

recalled, "[i]t really messed me up. When I was free, I would be with him and look after him."

(Ex. 1). It was hard for William to process that Craig would never again be in his life.

   William has seen too much criminal activity to ever feel safe in Chicago. (Ex. 1). Street

violence has always been an integral part of his existence. Seeing people getting beaten, shot,

and robbed was just a part of his daily life. (Ex. 1). There were always groups of people around

who were causing trouble in the neighborhood. (Ex. 1). Some of it was gang activity. (Ex. 1).

Some of it was neighborhood or personal disputes. (Ex. 1). It did not matter to William who was

causing the trouble because innocent people were almost always the victims in these altercations.

   The shock of losing so many people he loved to violence and the resulting emotional

ripple has constantly turned William's life upside down. William is not alone in his anguish.

Research suggests "violent or sudden death can result in more psychological distress and

increased risk for mental disorders after bereavement."[7] Furthermore, "traumatic deaths elicit

profound feelings of shock, confusion, and above all, helplessness in the survivors. Since they

are frequently perceived by mourners as involving human volition, and therefore human error or

malevolence, traumatic deaths are more likely to provoke rage at others (e.g., a perpetrator or

God), as well as intense feelings of guilt for not having prevented the death. "[8] Even without this

---

[6] *Chicago Police Release April 2022 Crime report, ABC7 Chicago* (May 1, 2022),
https://abc7chicago.com/chicago-crime-police-department-report/11810226/
[7] James M. Bolton, et. al*., Consequences of Sibling Death: Problematic, Potentially Predictable, and Poorly Managed,* 171 JAMA Pediatrics 519, 520 (2017).
[8] Phyllis S. Komensky & John R. Jordan, *Attachment Informed Grief Therapy: The Clinician's Guide to Foundations and Applications* 89 (2016).

research, William could describe the gut-wrenching pain and emptiness these losses have caused.

William has suffered extensive and inexorable losses throughout his life, which should be

considered by this Court when sentencing him.

### 3. William is devoted to his children, who love him and need him in their lives

William has three children: William McBeth III is 15 years old, Armani McBeth is 14

years old, and Nala McBeth is six years old. (PSR, ¶116, 118). For William, his children are his

world, and they are devoted to him. William continues to have a relationship with his children

while in custody and speaks to William III "all the time." (PSR, ¶119). William also has a "great"

relationship with Armani, and they speak twice a week. (PSR, ¶121). Armani's mother

emphasizes how "William has always been there. He never missed a Birthday, and he never

missed a Holiday…He helped in any way that he could for all his children, not just my son." (Ex.

3).

William also has a close relationship with his stepson, Keshon, who explains that while

he has struggled not having his biological father in his life, William has helped fill that void. (Ex.

4). Keshon recounts a time when he told his mother he was not going to go to school anymore

because everyone else had fathers who picked them up, dropped them off, and went to all their

school events. (Ex. 4). Then, "the next day my mom woke me up for school but instead of me

catching the bus to school my dad/William drove me … told me that he knows he is not my real

father but he is going to treat me like I'm his real son. And from that day forward he did what he

said." (Ex. 4).

William is in a committed relationship with Nala's mother, Lakeisha, and he resided with

Lakeisha and Nala, before his arrest. (PSR, ¶122). He speaks with Nala frequently. (Ex. 1).

Nala's letter attached to this memorandum encapsulates her wish that her father comes home.

(Ex. 5). Recently, Nala asked William why he was in custody and not home with her and her mother. William responded, "I ran a red light." (Ex. 1). Nala responded, "Mommy ran a red light, and she did not have to go to jail." (Ex. 1). William has struggled with the best way to tell his children why their father is incarcerated. He has learned, however, that telling them the truth is the only way to move forward.

William is frantic when he considers the life his children will have if he is imprisoned for any extended length of time. William's three children spent every weekend with him before he was incarcerated for this offense. (Ex. 1). He took them to the indoor water park at Great Wolf Lodge in Gurnee, Illinois. (Ex. 1). They would also go to amusement parks to ride in go-karts, play paintball, and hang out in game rooms. (Ex. 1). He wanted his children to have a paternal role model and a childhood that was different from the life he led. (Ex. 1). His children have been able to visit him several times since he has been in custody. (Ex. 1).

If William receives a lengthy sentence, his children's lives will be immeasurably affected by their father's incarceration. According to research, "1 in 4 Black children will have a father who has been incarcerated by the time they turn 14. That's millions of children not only experiencing the pain and stigma of having a parent behind bars, but also the myriad adverse consequences that come along with it, including financial hardship, health and educational challenges, and often permanent separation from their parents as a result of incarceration. These troubling outcomes - and our failure to address them - underscore our misplaced presumption that incarceration can solve social ills and the fundamental lack of appreciation for the multitude of harms that accompany it."[9] William's children already understand how much they will miss their father. Their loss is incalculable.

---

[9] Ebony Underwood & Miriam Aroni Krinsky, *Millions of Children Lost Their Parents To Incarceration. That Doesn't Have To Happen,* The Appeal, (Oct. 24, 2019) https://theappeal.org/millions-of-children-lose-their-parents-to-incarceration-that-doesnt-have-to-happen/

### B. William Has Plans For the Future

William has battled mental health issues off and on, going back to childhood. Since he has been in custody, his mental health struggles have reemerged. After his arrest, he experienced auditory hallucinations, stating that he "felt as if the walls were taking to [him]." (PSR, ¶131). In hindsight, William believes such may have been caused by being locked in his cell "too long" due to COVID-19 precautions. (PSR, ¶131). While detained at the Metropolitan Correctional Center during this time, William spoke to a psychiatrist, who provided aid and books to read. (PSR, ¶131). William feels he is "doing better now." (PSR, ¶131). Even so, William believes he would benefit from mental health treatment and therapy in the future. (PSR, ¶130).

Still, William has tried to turn the negative experience of being in custody into something positive. He has taken every opportunity to expand his knowledge and further his education. His efforts are reflected in the more than 200 pages of certificates attached to this memorandum. (Ex. 6). Taking these classes has allowed William to keep some of his negative thoughts and attitudes at bay while inspiring him to educate himself. He has taken courses to elevate his work skills and prepare him for a future outside prison walls such as classes on computer skills, personal finance, commercial driving, the transportation industry, and personal leadership. He has taken these courses intending to obtain his commercial driver's license and work for a trucking company. (Ex. 1). His eventual goal is to be his own boss and operate his own trucking business to support himself and his family. (Ex. 1). William realizes this will be a slow process, but he is patient. William will do whatever he needs to do to support his family and positively impact society.

William has also received certificates demonstrating his desire to enhance his personal growth, such as classes in coping with stressful life events, staying healthy, prison reentry, learning how to be a better parent, concepts in biblical interpretation, biology, yoga, and a guide through the 12 steps of recovery. (Ex. 6). The last class is particularly significant as William has

14

expressed a desire to participate in substance abuse treatment while in custody. (PSR, ¶146).

William has opined that "as of now," he does not have a substance abuse problem, as he has been

sober. (PSR, ¶146). However, he did note that prior to his arrest, his substance abuse "wasn't all

the way gone." (PSR, ¶146). William understands all too well the challenges he will face when

he is released from custody. Drugs are everywhere. Thus, he is willing to use every available tool

to ensure he never again becomes a drug addict. He has come to realize that nothing good comes

from using drugs, and the only way to thrive personally and professionally is as a clean and sober

individual. (Ex. 1).

Most importantly, William cannot wait to see his three children outside of a jail visiting

room. (Ex. 1). His children are his strength. He talks to each of them on video call three times a

week, splitting up his time between each of his children. (Ex. 1). Without fail, one of the kids

will say, "Daddy, when are you coming home?" (Ex. 1). During the last call, Nala said, "I want

you to get out of jail." (Ex. 1). This is William's dream and his most significant plan for the

future. William's plans to stay sober and support his children reflect the requested sentence is

appropriate.

### IV. THE REQUESTED SENTENCE AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS A JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, AND PROTECTS THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

A sentence of 100 months is an appropriate sentence that reflects the seriousness of the

offense, promotes respect for the law, is just punishment, and protects the public from further

crimes. The requested sentence also considers general and specific deterrence. 18 U.S.C. §3553

(a)(2)(B) requires this Court to "afford adequate deterrence to criminal conduct" when imposing

a sentence. William's attitude, embarrassment, and genuine contrition are all reasons why he will

not reoffend.

William was taken into custody in January 2021, during the COVID-19 pandemic. William recalls the never-ending loneliness and desperation of that period: there were no family visits, no cafeteria, no classes, no rec, "no nothing." (Ex. 1) There was barely even time to shower. (Ex. 1). The jail was on a schedule of 23½ hours in your cell and a half hour out. (Ex. 1). During that half hour, you could shower, call your family, or stretch your legs. (Ex. 1).

Socializing with other inmates was nearly impossible. (Ex. 1). Another inmate would come to your cell to talk, touch the door, and then you would accidentally touch the same door. (Ex. 1). This would cause your mind to reel. What if this other individual was infected? Then you could get infected. (Ex. 1) And you could die. COVID-19 took an undeniable toll on everyone, but most especially on the incarcerated. For this reason and others, William's time in jail awaiting sentencing has been particularly grueling. Yet, despite his struggles with the restrictions, he has not had any disciplinary infractions since being locked up. (PSR, ¶5). His willingness to follow the rules imposed upon him in custody reflects his desire to follow the rules once he is released from custody.

As he has gotten older, he has grown acutely aware of the passage of time and the inevitable and gut-wrenching losses of friends, family, and loved ones. For William, there are few things more painful than receiving an unexpected and impersonal email informing him that someone has died or making a phone call home just to say, "Hey," and being told of another loss. (Ex. 1). As mentioned above, he lost his friend Craig Moore to street violence. He also lost his Aunt Mable Banks to illness while he was in custody. (Ex. 1; Ex. 7). Additionally, William's longest time in custody to this point was 180 days. That sentence is the longest amount of time that William has ever spent in continuous custody. He was 24 years old then and a much younger man than he is now. Given his background and lack of custodial time, a lengthy sentence will be

16

particularly onerous.

Most significantly for William, his daughter Nala McBeth was born in 2017. (PSR, ¶115). Being away from her has turned his world upside down. (Ex. 1). Before being arrested, he was with her every day, and he has felt her loss profoundly. (Ex. 1). Her birth has also caused him to reflect upon his own life, these charges, and the importance of taking responsibility for his actions. (Ex. 1). He knows he cannot change what has happened before, but he knows it is essential to teach all three of his children to take responsibility for their mistakes, admit them, learn from them, and move past them. (Ex. 1). Their love provides deterrence and stability in his life. His relationship with his children gives him hope for the future when he feels that he is going to fall apart. (Ex. 1).

William is remorseful for his actions and embarrassed by the shame they have brought upon his family. With each passing day, the reality of his actions and the subsequent repercussions shock him. He no longer has anything in common with the person he was in 2015.

As detailed above, William was using drugs to excess when he committed these crimes. In William's words, "I feel like a lot of bad choices I made in my life was because of being on drugs." (PSR, ¶142). He also recalled that when he was high, "I didn't think about consequences" and " I [now] take full responsibility for everything I did." (PSR, ¶142). Ultimately, William says, "I want to show society that I can be the person I want to be." (Ex. 1). William has made positive steps toward this goal but knows he still has a long way to go. He is confident he will get there. William will never again appear in a criminal courtroom, have contact with the criminal justice system, or be away from his children for an extended time. William is a changed man since he was involved in this illegal activity in 2015. He turned his life around and does not plan to go back. Moving forward is the only path. For this and the reasons

17

delineated above, the requested sentence is appropriate.

## V. THE CALCULATED CRIMINAL HISTORY CATEGORY OVERSTATES THE SERIOUSNESS OF WILLIAM'S BACKGROUND

Both William's criminal history category and the recitation of his criminal background in the PSR overstate the seriousness of his background. The Seventh Circuit has stated "sentencing policy recognized that a within-guidelines sentence may be inappropriately high when 'reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." *United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011). The age of William's criminal history and the types of cases in his background reflect that he has a low chance of recidivism.

First, many of William's previous convictions which receive points under the guidelines occurred when William was 20 and 21, almost 20 years ago. (PSR, ¶62-67). These convictions technically do receive points under the guidelines as they occurred within 10 or 15 years of the charged conduct. Yet in William's case, due to the age of the case when it was charged, these older convictions occurred long ago. The Sentencing Commission formulated this applicable time period calculation for a purpose, so older cases would not influence an individual's guideline calculations, yet in William's case they do. The court should consider that William was a completely different person when these cases occurred, a man with no children who had a recent history of living on the street and selling drugs instead of being in high school. Now William is almost 40 with a stable relationship and children to support. His criminal history, and the 12 points he receives for cases which occurred when he was just 20 and 21, do not reflect the seriousness of his criminal history, nor the likelihood he will commit other crimes in the future. *United States v. Nichols*, 740 F.Supp.1332, 1336 (N.D. Ill. 1990) ("criminal history categories are

more likely to overstate the likelihood of recidivism for an older defendant than for a defendant in his or her early twenties.").

Additionally, while William does not receive points for each traffic violation included in the PSR, Probation did attach particular significance to the number of traffic-related violations that William has received. According to Probation this reflects "a blatant disregard for adhering to established laws. The defendant's criminal history paints a portrait of a serial recidivist who cannot adhere to even basic driving regulations." (Prob. Sent. Rec. at 3). Yet Probation agrees that these traffic violations are not violent in any way. (Prob. Sent. Rec. at 3). While William does not dispute that he has been convicted of traffic violations, he submits this is a gross exaggeration and mischaracterization of these offenses. William often drove uninsured cars because he did not have money for car insurance. (Ex. 1). Then, his license would be suspended because of his lack of insurance. (Ex. 1). This does not reflect a "blatant disregard" for established laws, it reflects an individual struggling to make ends meet financially.

In fact, the most recent traffic violations resulted in dispositions of probation, terminated satisfactorily, because William purchased car insurance and/or reinstated his license, as required by the terms of his probation. Thus, he followed the rules and conditions imposed upon him by probation, showing that he could adhere to what probation refers to as "established laws."

## VI.   CORRECTIONS AND OBJECTIONS TO THE PRESENTENCE REPORT

William submits the following corrections and objections to probation's presentence report.

### A.  CORRECTIONS TO THE PRESENTENCE REPORT

William submits two corrections to the nature and circumstances of the offense described in the presentence report.

19

### 1. Paragraph #8

Paragraph 8 of the PSR recites that when Minor A met William on December 17, 2015, "defendant walked up to a car in which the Minor A was a passenger and asked how old she was. (PSR, ¶8). The PSR recites that "Minor B answered, and stated that Minor A was 19 years old." (PSR, ¶8). The grand jury testimony of Minor A reflects that in fact, both Minor A and Minor B stated that Minor A was 19. (GJ_002-000017). Therefore, William respectfully requests the presentence report at paragraph 8 be corrected to state "They answered, and stated that Minor A was 19 years old" instead of "Minor B answered."

### 2. Paragraph #11

Paragraph 11 of the PSR states that on December 19, 2015, William called Minor A and picked her up. Minor A's grand jury testimony reflects that on December 18, 2015, Minor A called William and "told him to come back and get me" and William picked Minor A up the next morning on December 19, 2015. (GJ_002-000027). Therefore, William respectfully requests paragraph 11 be corrected to state "the following morning (December 19, 2015) William picked up Minor A from the group home, after she had called him to come get her."

## B. OBJECTIONS TO THE GUIDELINE CALCULATION

William submits the following objections to the sentencing guideline calculation in the presentence report.

### 1. Objection to § 2G1.3(b)(2)(B) unduly influence minor to engage in prohibited sexual conduct

The probation department argues this enhancement applies as "the defendant otherwise unduly influenced a minor to engage in prohibited sexual conduct" and highlights the over 10 year age gap between the minor and William.[10] In order for this enhancement to apply, the

---

[10] Application Note 3 to this section states this age difference creates a rebuttable presumption this enhancement applies.

Sentencing Commission in Application Note to this section states "the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." App. Note 3(B) to U.S.S.G. § 2G1.3(b)(2)(B). When the court analyzes the behavior William has pled to, it will reflect that his behavior did not "compromise the voluntariness" of Minor A's behavior.

First, Minor A's grand jury testimony, recounts how before she met William, she already had pursued engaging in sexual acts for money. (GJ_002-000011). This alone reflects that William did not exert undue influence over the minor, as she was predisposed to this behavior. As recited in the PSR and government's version, Minor A became involved in prostitution through her relationship with Minor B. (PSR, ¶7-9). Minor B's grand jury testimony describes how Minor B explained to Minor A how she could make money by having sex with men before she ever met William. (GJ_001-000008). Minor B also testified that the two had talked about "doing dates with guys" before they left the group home on December 17, 2015. (GJ_001-000012). The PSR also explains how on December 17, 2015, other individuals were present when Minor A first engaged in commercial sex. (PSR, ¶9). The PSR nor any statement from Minor A reflects that her first involvement in this activity was at all influenced by William, only that he was the driver of the vehicle on that first night. The PSR recounts that Minor A's interactions with William before arriving at a home with another girl on December 17, 2015 were minimal. There is no evidence that on that night William exerted undue influence over Minor A.

Courts have found in cases similar to William's that this enhancement does not apply. For example in *United States v. Calvo*, although there was the same rebuttable presumption due to age, the court found "[t]he evidence shows that the victim went to the internet chatroom of her

own accord, willingly befriended Calvo, voluntarily engaged in sexual banter with him, requested that he pick her up, and willingly engaged in the sexual acts at issue." *United States v. Calvo,* 596 Fed.Appx. 541, 543 (9th Cir. 2015); *United States v. Myers*, 481 F.3d 1107 (8th Cir. 2007) (finding "despite the difference in their ages, Myers did nothing that compromised Doe's volition, however misguided it may have been"). The circumstances of the offense and the actions of William reflect that he did not unduly influence Minor A to engage in any sexual conduct, and this enhancement should not apply.

### 2. Objection to § 2G1.3(b)(3)(B) use of computer

The government alleges in its version of the offense that this enhancement applies both because William used a cell phone to call and text minor A, and because there were "commercial sex advertisements" posted on the internet. (Gov. Version at 10). The probation department argues this enhancement should apply due to the advertisements posted online. (PSR, ¶34). In order for this enhancement to apply in any case, there must be "the use of a computer or an interactive computer service to ... entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor." Neither William's use of a cell phone nor the advertisements posted online lead to the application of this enhancement.

First, the government's argument that a cell phone is a computer cannot support this enhancement. While the government accurately recites the definition of computer contained by reference in § 2G1.3(b)(3)(B), and while today cell phones can accomplish tasks previously only accomplished by computers, William did not use a cell phone in place of a computer. The allegations of his cell phone use are to text and to call, the primary uses of a telephone, not a computer. Just because the technology of cell phones has progressed does not mean that any individual who uses a cell phone is using a computer, under any definition. This enhancement was put in place to punish individuals who used a computer in the commission of the crime. If

the Sentencing Commission sought to further punish those who used phones in the commission

of these types of charges, there would be a separate enhancement. The government cannot

conflate computer and phone use just because technology has advanced. There is no evidence put

forth by the government that William even used a "smartphone" during this offense, the only

type of phone that is even close to a computer.

Second, the advertisements for commercial sex cannot be used to support this

enhancement, as there is no evidence that William was the individual who posted these

advertisements. The government has only alleged these advertisements existed, and the phone

number associated with them was not William's phone number. The burden is on the government

"to prove by a preponderance of the evidence that a particular sentencing enhancement is

warranted." *United States v. Hines*, 449 F.3d 808, 815-816 (7th Cir. 2006) (internal citations

omitted). The government will be unable to prove that William used a computer to post these

advertisements. Therefore, this enhancement cannot apply.

### 3.   Objection to 5 point increase under § 4B1.5(b)(1)

A five-point increase under 4B1.5(b)(1) should not be applied in William's case. This

increase only applies if "the defendant engaged in a pattern of activity involving prohibited

sexual conduct" U.S.S.G. § 4B1.5(b)(1). A "pattern of activity" is defined as "on at least two

separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G.

§ 4B1.5(b)(1) App. Note 4(B)(1). The probation department argues William should receive this

increase because the minor "engaged in commercial sex acts, at his direction, on two or more

occasions." (PSR, ¶44). The government agrees that this increase applies. (Gov. Version at

11-12). Yet under the definitions of "pattern of activity" and "two separate occasions" the

conduct William has pled to did not occur on separate occasions.

In order for this enhancement to apply, the court must look to the definition of "separate

occasions" contained in the definition of pattern of activity. U.S.S.G. § 4B1.5(b)(1) App. Note 4(B)(1). The Supreme Court recently interpreted the meaning of "occasions different from one other" and this same meaning can be applied to the definition of "separate occasions." *United States v. Wooden*, 595 U.S. 360 (2022). The court in *Wooden* stated the term occasion "commonly refers to an event, occurrence, happening, or episode. … And such an event, occurrence, happening, or episode—which is simply to say, such an occasion—may itself encompass multiple, temporally distinct activities." *Id.* at 367. The Supreme Court stated "that a range of circumstances may be relevant to identifying episodes of criminal activity" and "the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion" *Id.* at 369.

Since *Wooden*, courts have interpreted this meaning of separate occasions in relation to the enhancement in § 4B1.5(b). For example, in *United States v. Jimenez*, the court found the five point enhancement under § 4B1.5(b) did not apply in a production and distribution of child pornography case. *United States v. Jimenez*, 2022 WL 1015396, *1 (S.D. Fla. Apr. 4, 2022). In *Jimenez*, the government argued that because the "defendant perpetrated two different sexual acts against the victim—producing the snapchat video and then assaulting the victim—these acts also constitute separate occasions." *Id.* at *4. Yet the court found, these were "distinct offenses that comprise a single occasion" *Id.* at *5. The court reasoned, "under the Government's interpretation, an act is synonymous with an occasion. But this is a false equivalency. Indeed, this strained interpretation defies the plain meaning of the statute." *Id.* at *4.

The same application of "occasion" can apply to William's case. The "acts" that the probation department and the government argue are separate occasions are truly part and parcel

of the same act, the charged conduct in the case. The occasions form the basis of the charges and share a "common scheme or purpose" and are "similar and intertwined." *Wooden* 595 U.S. at 369. The purpose of this enhancement is to punish repeat offenders who have multiple instances of prohibited sexual conduct with minors. The term "repeat" itself implies an individual convicted of previous sexual allegations against minors, not that the repetition occurred within the charged conduct of the case at hand. Courts in this district have agreed, and not applied this enhancement to an individual, although that defendant had multiple sexual interactions with minors over the course of the charges. *United States v. Osborne*, 17CR73 (N.D. Ill. Sept. 30, 2019) Dkt. 152.[11] In *Osborne*, the court ruled that "the five level enhancement really is directed to somebody that - the context and the spirit of this guideline and the statutes that fall under the guideline really are directed to individuals who are engaged in a pattern of behavior that goes outside of really one offense. I mean, it talks about occasions. It talks about prior convictions. It is really trying to get at somebody who is a repeat offender." *Id.* at 30. Although the conduct in the charges in *Osborne* "occurred over - at least in the charging documents it occurred over a three-year time span" the court still did not impose the enhancement, as all of the defendant's actions were part and parcel of the charges, not separate occasions. *Id.* at 31.

The allegations of "different occasions" in regard to William are solely separate acts which make up the entire occasion of the case charged. Since these events do not constitute a pattern of activity, this 5 point increase should not be imposed.[12]

### C. OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE

Special condition 9 recites a number of requirements related to sex offender treatment and conditions. This includes a condition that William not "engage in activities that will put you

---

[11] The transcript of this sentencing is included as Ex. 10.
[12] If this court does find this enhancement applies, the defense respectfully requests in the alternative that the court consider this argument under the §3553(a) factors.

in unsupervised private contact with any person under the age of 18." William requests that this condition be amended in order for him to be able to interact with his three children and step child. There are no indications that he is a risk to any of his children, nor has he ever been. This condition as written is overly broad and should be amended .

## VII.    CONCLUSION

William is not the same person he was in 2015. In the years after this offense and before his arrest, he completely withdrew from all criminal activity, got sober, and did nothing but concentrate on building a supportive life for his family and daughter. He is remorseful and ashamed of his actions that led to these charges, and knows that he will never again be involved in this type of activity. William's plans for the future, the rehabilitation he has experienced since 2015, his difficult childhood, and the support he has from his family all reflect that a sentence of 100 months is appropriate.

Respectfully submitted,

s/ Jonathan S. Bedi

Jonathan S. Bedi
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1101
Chicago, IL 60604
(312) 525 2017
jbedi@bedisinger.com

26

**<u>Certificate of Service</u>**

I, Jonathan S. Bedi, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court  using the CM/ECF system.

<u>/s/ Jonathan S. Bedi</u>
Jonathan S. Bedi
