UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 21 |
| v. | Judge Franklin U. Valderrama |
| WILLIAM MCBETH,<br>also known as "Tony" | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits this position paper as to sentencing factors, and asks the Court to sentence defendant WILLIAM MCBETH to a below-Guidelines sentence of 18 years' imprisonment, which is warranted and sufficient, but not greater than necessary, under 18 U.S.C. § 3553(a).

### I.    BACKGROUND

In December of 2015, Minor A, fifteen years old, was in the care of Illinois DCFS, and lived in a DCFS group home in Chicago. Minor A was separated from her younger sisters, also in DCFS custody but living separately away from Minor A. Minor A wanted to earn money so that she could buy winter coats and Christmas presents for her sisters. Instead of accomplishing her holiday goal, Minor A, at defendant's direction, had sex with men in their apartments and houses in exchange for money. Defendant, not Minor A, kept almost all of the thousands of dollars she earned. He gave her drugs and alcohol to keep her working. He used the money she earned to buy himself a car. And on Christmas Eve, he took her back to the DCFS

1

group home, giving her little more than $100 and leaving her with a lifetime of emotional scars.

In 2021, defendant was charged with sex trafficking of a minor and with transportation across state lines of an individual, Minor A, with the intent that Minor A engage in prostitution, in violation of 18 U.S.C. §§ 1591 and 2421. Dkt.[1] 21. Sex trafficking of a minor has a mandatory minimum sentence of 10 years' incarceration and a maximum sentence of life. *See* 18 U.S.C. § 1591.

In 2024, On April 2, 2024, defendant pleaded guilty, pursuant to a written plea agreement, to a superseding information charging two transportation counts in violation of § 2421. Dkt. 91. In the plea agreement, defendant also agreed to the commission of a stipulated offense: sex trafficking of a minor in violation of 18 U.S.C. § 1591. *Id.* As a result of defendant's plea, the statutory maximum sentence is 20 years' incarceration and there is no mandatory minimum sentence.

## II.  OFFENSE CONDUCT

In December of 2015, Minor A was fifteen years old, living in a DCFS group home in Chicago. G.V. Ex. A at 1. She was looking forwarding to an upcoming trip to see her little sisters at the skating rink, because she did not get to see them that often since they had been given separate DCFS placements.

---

[1] References to the docket are "Dkt." followed by the docket number. References to the Presentence Investigation report are cited as "PSR" followed by the paragraph number. References to the Government's Version of the Offense is "G.V." followed by the page number, and exhibits to the Government's Version are cited as "G.V. Ex." followed by the exhibit number.

A friend at the DCFS group home, Minor B, took Minor A out with her one night, where Minor A met defendant, whom she was introduced to as "Tony." Immediately upon meeting Minor A, defendant offered her cocaine, and gave her alcohol and marijuana. *Id*. at 4-6. The very first night defendant met Minor A, he and his friends drove her to a house, and Minor A felt like she didn't have "any choice" but to go into the house with another female. *Id*. at 6. Once inside, it was soon clear to Minor A that she was expected to have sex with the man in the house for money, and she did. *Id*. at 6-7.

The next morning, Minor A asked defendant to take her home; she did not want to miss her time at the skating rink with her sisters. *Id*. at 7. While defendant said "okay," he didn't take her home. *Id*. at 7-8. Instead, he took her to a department store to get her makeup done, asking the employee to make Minor A look more mature. *Id*. at 8. Minor A asked defendant again to take her home, but instead of taking her home, he took her to a house and handed her a condom. *Id*. at 8. Minor A understood she was supposed to have sex with the man inside and she did, giving all the money to defendant. *Id*. She had sex with one additional man before defendant finally took her home, giving her only approximately $50 of the money she earned. *Id*.

Minor A missed her time with her sisters, and she was upset because she learned the group home had not even arranged for the transportation for her visit even if she had been there. *Id*. at 9. She was frustrated and upset with living in the group home, and called defendant and asked him to come get her. *Id*. She thought if

she worked for defendant she would receive half of what she earned, and thought she only got $50 from the first night because she only had sex with a few men. *Id*. at 18.

The next day, December 18, defendant picked her up right in front of the group home, with his girlfriend, Individual G, in the car. *Id*. at 9. Over the next several days, at defendant's direction. Minor A had sex with numerous men – giving the proceeds to defendant. At times, Individual G joined Minor A and also had sex with men in exchange for money. Minor A described some of her worst experiences during those commercial sex acts, in her own words:

> "I went on a date[2] with a guy who didn't want me to leave at the end, he didn't speak English and he kept saying his time wasn't up. He was rough with me and he put his fingers inside me. His nails were long and I told him to stop and be gentle, but it didn't. He made me bleed. [Defendant] was calling me, but I couldn't answer because I was trying to calm the guy down. [Defendant] was also honking at me. I had told [defendant] I was going to come out, but I couldn't get away from the john. [Defendant] didn't come in and help me or anything. The john kept pacing back and forth, it was really scary. I eventually had to lie to the john and say I would come back later just to get out of there. When I got back to the car, I was in a lot of pain. I gave Tony the money." *Id*. at 14-15.

> "I remember the worst john, he lived in a condo building in Chicago. . . . I did that date with [Individual G]. . . . I was wearing that dress that [defendant] bought me, and I was freezing. . . . I thought [the john] was creepy. . . . [The john] told me to come over, [Individual G] gave him oral sex and he started to give me oral sex. He was laying down on his back, my head was facing his feet, and [Individual G] grabbed my arms and held me there so I couldn't get up while she was giving him oral. As she was holding me down, she was reaching over to his wallet which was nearby, and stealing money. . . . To this day, I can still see his face and feel him. . . . I came down the elevator and I cried." *Id*. at 13-14.

---

[2] "Date" is a slang term meaning an encounter where an individual engages in sexual acts in exchange for money. "John" is a slang term for customer who purchases sexual acts in exchange for money.

Defendant repeatedly put Minor A in harms' way for his own profit. When she needed help from a violent customer, he didn't help her. And his girlfriend, Individual G, did not help Minor A either. Instead, she too victimized Minor A, holding her down and forcing her to continue to engage in a sex act with a "creepy" stranger. While she was with defendant, Minor A had sex with up to six or seven men a day. Id. at 13.

Defendant was in control. He decided when Minor A was going to have sex, and he set the prices for her sex acts. *Id*. at 12. Minor A recalled that once a john did not give her as much money as she was supposed to get, and when defendant realized it, she said "he was mad and I was scared" and he "snatched the money right out of my hand." *Id*. at 14. Defendant decided when and if Minor A would eat. She recalled being "hungry" and that there were times that defendant would eat food but not give her any. *Id*. at 10. Defendant gave her alcohol and marijuana "the whole time" she was with him "every day." *Id*. at 18. Defendant decided where they would sleep at night, various hotels around the Chicago area and, for one night, at Individual G's residence in Wisconsin. *Id*. at 10, 15. Defendant carried a gun, which Minor A saw on his hip. *Id*. Defendant and Individual G drove her all around the Chicago area and up to Wisconsin, and Minor A did not have any other means of transportation to get back to her home. Minor A explained:

> "There were times when I was with [defendant] and I didn't want to go on dates, but I did anyway. I was scared. [Defendant] wouldn't speak to me, only give me directions. [Defendant] was only feeding me if he wanted to feed me. Some of the johns were also aggressive and scared me. I had no where to go, I was stuck with [defendant], I didn't know where I was, the only option was to stay." *Id*. at 18.

5

Over the span of several days, Minor A repeatedly asked to go home. *Id.* at 17. Defendant finally took her back to the DCFS group home on Christmas Eve, only giving her approximately $40 of the thousands of dollars she had earned – far less than she expected. *Id.* at 17. Defendant kept the rest for himself. On December 23, 2015, he used $2,000 of the funds earned by Minor A to buy himself a Lexus; paying the $2,000 in cash as a down payment and financing the rest.[3] Dkt. 1 at 19-20.

The first night defendant met Minor A, she lied and told him that she was nineteen. Defendant knew, however, that Minor A looked young, because that is why he got makeup applied to her to make her look more "mature." Defendant also knew that Minor A lived in a DCFS group home: a home for children. After defendant returned Minor A to the DCFS group home on Christmas Eve, he continued to try to contact her. On January 6, 2016, he and his friends went to the group home and entered the home, asking an employee for "[Minor B's][4] girls" which the group home employee knew included Minor A. G.V. Ex. B. Defendant knew to look for Minor A at a group home for children, evidence that he was aware that she was not actually nineteen.[5]

---

[3] In order to obtain financing for the Lexus, defendant gave the dealership fake paystubs which falsely reported that he worked at a plumbing business. Dkt. 1 at 18-19. He also signed a loan application, falsely listing that he had monthly income of $3,600. *Id.* at 20-21. Defendant did not make loan payments as required and ultimately the loan was charged off with a balance remaining unpaid. *Id.* at 24.

[4] Minor B was a fellow group home resident and was the same girl that had been with Minor A on the night she met defendant.

[5] Under § 1591, a defendant is guilty of sex trafficking of children if he (1) knew the victim was under 18; (2) recklessly disregarded the fact that the victim was under 18; and/or (3) had a reasonable opportunity to observe the minor victim. Under any scenario, the mandatory

## III. CORRECTION TO PRESENTENCE INVESTIGATION REPORT

Defendant has a July 2011 prostitution-related arrest by the Chicago Police Department for keeping a house of ill fame which is not reflected in the "Arrests" section of the PSR at paragraphs 82-102. G.V. Ex. C. The PSR should be amended to include this arrest; this arrest did not lead to a conviction.

## IV. STATUTORY MAXIMUM PENALTIES

The maximum penalty for a violation of 18 U.S.C. § 2421 is 10 years' incarceration, a maximum fine of $250,000, and a term of supervised release of at least five years and up to any number of years, including life. Therefore, the total term of incarceration for both counts is 20 years' imprisonment.

Additionally, the Court must order a $100 special assessment per count, for a total of $200. Pursuant to 18 U.S.C. § 3014, defendant must be assessed an additional $5,000 special assessment per count, for a total of $10,000, if the Court determines that defendant is a non-indigent person.

## V. THE PROPERLY CALCULATED GUIDELINES RANGE IS 20 YEARS' INCARCERATION

As a matter of process, the district court must properly calculate the Guidelines range, treat the Guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the Guidelines range. *Gall v. United States*, 522 U.S. 38, 46 (2007).

---

minimum is 10 years' incarceration if the victim is over 14, and the maximum term of incarceration is life. 18 U.S.C. § 1591(b)(2).

### A.       Offense Level Calculations

The government agrees with the base offense levels, enhancements, and reductions set forth in the PSR with one exception: the application of the grouping rules. It is the government's position that Counts One, Two, and the Stipulated Offense are all treated as part of the same Group because they all relate to the same victim, Minor A, and were all connected by a common criminal objective or common scheme or plan: defendant's plan to cause Minor A to engage in commercial sex acts. U.S.S.G. § 3D1.2(b). Accordingly, the applicable offense level is the offense level for the offense that has the highest offense level – which in this case is the stipulated offense: sex trafficking of Minor A. U.S.S.G. § 3D1.3(a).

The Probation Office believes that Count 2, the transportation of Minor A on December 22, should not be grouped with Count 1 and the stipulated offense because the Probation Office views the travel on that day as "harm to the victim on an occasion different than Count 1." PSR ¶ 23. The government respectfully disagrees with the Probation Office's assessment. As part of the stipulated offense, defendant agreed that he engaged in sex trafficking of Minor A in December 2015, which includes both her travel to Wisconsin on December 21 (Count 1) and her return trip to the Chicago area the following day (Count 2). Therefore, both counts and the stipulated offense are part of defendant's common scheme or plan and should all be part of the same group under Guideline § 3D1.2(b).

The applicable Guidelines for the stipulated offense are summarized as follows; the government set forth law and facts in support of the various enhancement in the

Government's Version of the Offense at pages 9-12. The Probation Office reached the same calculations as the government with respect to the stipulated offense:

| Base offense level (Guideline § 2G1.3(b)(2)(B), PSR ¶ 24) | 30 |
|---|---|
| Enhancement because defendant unduly influenced a minor to engage in prohibited sexual conduct (Guideline § 2G1.3(b)(2)(B), PSR ¶ 25) | +2 |
| Enhancement because the offense involved the use of a computer and/or interactive computer service to entice, encourage, offer, or solicit sexual conduct with a minor (Guideline § 2G1.3(b)(3)(B), PSR ¶ 26) | +2 |
| Enhancement because the offense involved the commission of a sex act or sexual contact (Guideline § 2G1.3(b)(4), PSR ¶ 27) | +2 |
| Acceptance of responsibility (Guideline § 3E1.1, PSR ¶¶ 45) | -3 |
| Enhancement for repeat and dangerous sex offender against minors (Guideline § 4B1.5(b)(1), PSR ¶ 44) | +5 |
| TOTAL OFFENSE LEVEL | 38 |

**B. Criminal History**

The government agrees with the criminal history calculations set forth in the PSR. *See* PSR ¶¶ 54-77. Specifically, defendant has 18 criminal history points and a criminal history category of VI. PSR ¶ 78. The Probation Office located additional convictions which were not listed in the plea agreement. Dkt. 91 at 10-12.

**C. Advisory Guidelines Range**

With a criminal history category of VI, and an offense level of 38, the advisory Guidelines range is 360 months to life imprisonment, in addition to any supervised release or fine imposed by the Court. However, pursuant to Guideline § 5G1.1(a), when the statutory maximum sentence is less than the minimum of the applicable Guidelines range, the statutory maximum sentence shall be the Guidelines sentence. Therefore, the advisory Guidelines range is 240 months' (20 years') incarceration, which is the total statutory maximum term of incarceration.

9

## VI.    A SENTENCE OF 18 YEARS' INCARCERATION IS APPROPRIATE UNDER SECTION 3553(a)

The facts of this case, together with the factors set forth in 18 U.S.C. § 3553(a), warrant a sentence of 18 years' incarceration. Such a sentence is sufficient, but not greater than necessary, to comply with statutory sentencing goals set forth in 18 U.S.C. § 3553(a). In particular, it is the government's position that a below-Guidelines sentence of 18 years' incarceration accounts for the serious nature of defendant's offense, provides just punishment, affords adequate deterrence and will protect the public from further crimes of the defendant. At the same time, the recommended sentence takes into consideration the mitigating factors that are present in this case, set forth below.

### A.    Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Defendant's offense is extremely serious. Minor A was a child; her biggest worries should have been an upcoming math test or what to wear to school the next day. Instead, she was plunged by defendant into a world where she had sex with men unknown to her so that the defendant could profit. Defendant was in control: where Minor A could sleep, when Minor A would eat, when Minor A would have sex, and who got to keep the money she earned: defendant himself. Minor A was injured by a john, who digitally penetrated her until she was bleeding. Defendant did nothing to help her other than to sit in his car and honk. This was a heinous crime.

Minor A will forever have to live with the consequences of defendant's offenses. The offenses continue to take a toll on Minor A, and the government anticipates that

Minor A will make a victim impact statement at sentencing explaining how the offense continues to damage her mental health to this day. Additionally, each time defendant sent Minor A into a house to have sex with a stranger, he put her at serious risk of contracting a sexually transmitted disease, assault, physical abuse, or even death. All of these risks and effects are magnified because of Minor A's age – she was at an age where she was the most vulnerable, impressionable, and malleable. *See*, *e.g.*, *United States v. Patterson*, 576 F.3d 431, 441 (7th Cir. 2009) (transporting minor to engage in prostitution is a crime of violence because of the "significant risk of violence against the victim by the perpetrator as well as third parties."); *United States v. Carter*, 266 F.3d 1089, 1091 (9th Cir. 2001) (transporting a minor to engage in prostitution is a crime of violence because prostitution involves serious potential risk of contracting a sexually transmitted disease, and the risk of assault or physical abuse the "johns" or by the pimp); *See United States v. Curtis*, 481 F.3d 836, 838-39 (D.C. Cir. 2007) (state crime of promoting prostitution of a minor is a crime of violence because prostitutes risk serious physical harm from customers and from their pimps, and child prostitutes are particularly vulnerable to such violence).

For all of these reasons, the nature and circumstances of defendant's crime, weighs in favor of imposing a significant term of imprisonment of 18 years' incarceration. Such a sentence will reflect the seriousness of defendant's conduct, provide just punishment, and promote respect from the law.

### B. Defendant's History and Characteristics, and the Need to Protect the Public From Further Crimes by the Defendant

Defendant's history and characteristics present both aggravating and mitigating factors, discussed below. The government's recommendation of 18 years' incarceration incorporates the mitigating aspects of defendant's history and characteristics. And the government's recommendation – coupled with the government's significant concession in allowing defendant to plead to charges with a statutory maximum of 20 years' incarceration instead of life – reflect a serious departure from the advisory Guidelines range.

#### 1. Defendant's Significant Involvement in the Commercial Sex Trade

Defendant was involved in the commercial sex business for years and was not deterred by his interactions with law enforcement. In July 2011, defendant was arrested with Individual G, his girlfriend, after an undercover police officer came to Individual G's residence for purposes of prostitution. G.V. Ex. C. Defendant fled on foot, but was ultimately detained by the police after a short chase. *Id.* During his post-arrest statement in January 2021, defendant told law enforcement that after this arrest, he and Individual G only did "outcalls," meaning they would come to the customer's residence or other location for the commercial sex acts, rather than having the customer come to their residence or hotel room. He did not stop, he just changed methods to avoid detection.

In November 2011, defendant was again arrested for a prostitution-related offense after officers in Des Plaines observed Individual G enter a hotel room while defendant remained in the hotel lobby and in his vehicle. PSR ¶ 71. Individual G was arrested after the officers heard moaning in her room; the man inside her room said that Individual G was a prostitute that he found on a website. *Id*. Defendant as convicted of keeping a house of prostitution and was sentenced to court supervision, which was later revoked. *Id*.

In 2014, defendant and Individual G were again arrested after Individual G met a customer for purposes of commercial sex acts, and once the acts were completed, Individual G stole the customer's wallet. G.V. Ex. D at 1. When the customer ran after Individual G, he encountered defendant, who made a threatening motion at the customer as if defendant was withdrawing a weapon from his waistband. *Id*. Defendant and Individual G then got into a car and drove away with the wallet. *Id*. After their subsequent arrest, Individual G told police she performed commercial sex acts and gave all the money she earned to defendant. *Id* at 7. According to the police, defendant admitted "knowing what [Individual G] was doing" and that they shared whatever money she made. *Id*. This arrest led to defendant's conviction in 2016 for pimping/promoting prostitution. PSR ¶ 72. However, it did not dissuade defendant from continuing to act as a pimp, including trafficking Minor A as part of his offense conduct in this case.

Defendant's role in the commercial sex industry did not end with Minor A, either. According to an FBI interview report, an employee at a Chicago-area hotel

told law enforcement in August 2017 that defendant often stayed at the hotel with Individual G and young girls, whom the employee believed that defendant was prostituting. G.V. Ex. E. The employee said that defendant had been banned from reserving rooms at the hotel because of the young girls engaged in prostitution. *Id*. at 2. The employee recalled an incident in 2017 where he knocked on a hotel room door of a room rented by McBeth and a young girl answered. *Id*. The employee was concerned about the girl and asked if she was okay, and told her that she didn't need to be doing what she was doing (prostitution) and that the employee would help her. *Id*. at 1. Before the girl could answer, McBeth returned to the hotel in his car at a high rate of speed and yelled at the girl for opening the hotel room door. *Id*.

Defendant's interactions with law enforcement and with a hotel employee who tried to help did not deter him from engaging in the commercial sex industry for years, profiting off of multiple women and girls who put their bodies in danger by having sex with strangers.

### 2. Defendant's Lengthy Criminal History

Beyond the defendant's sex crime-related criminal history, defendant also has numerous arrests and convictions, including possession of a controlled substance (2003), criminal trespass to a vehicle (two convictions in 2006); bringing contraband into a penal institution (2007); obstructing justice (2007); and possession of contraband cigarettes (2018). PSR ¶¶ 60, 63, 64, 65, 66, 76. Many of defendant's additional convictions were traffic-related infractions. Because of his many convictions, defendant is a Criminal History Category VI. Even if the relatively minor

nature of many of these convictions indicates that defendant's CHC overstates his criminal history, his Guidelines range would still be above the 18 years' incarceration requested by the government even if he were CHC I, as that Guidelines range would be 235 to 240 months' incarceration.[6]

Defendant's criminal history highlights a significant factor in aggravation: defendant has a history of poor compliance with terms of release, indicating he is a significant risk of recidivism. Defendant has repeatedly shown a lack of respect for the law and for conditions put in place by courts. According to the Pretrial Services Report, defendant has had at least six prior bond forfeitures. Dkt. 7. Defendant also had violations of conditions of probation/release in at least six separate cases, sometimes with repeated violations in the same case. PSR ¶¶ 54, 60, 65, 66, 72, 75. Defendant has a prior conviction for Obstructing Justice/Destroying Evidence (2007) as well as a prior conviction for Bringing Contraband into a Penal Institution (2007). PSR ¶¶ 65, 66. According to the dates of arrests and convictions in the PSR, there are multiple instances where defendant was arrested while he was either on pretrial release and/or probation for a previous crime.

Moreover, even after his arrest in this case, defendant lied to Pretrial Services and said that he was currently employed by Amazon. Dkt. 7, 11 at 8. Individual G, his girlfriend, told the Pretrial Services Officer that defendant had stopped working at Amazon months ago. *Id.* In his post-arrest, defendant told law enforcement not

---

[6] With an offense level of 38 and a Criminal History Category of I, the advisory Guidelines range is 235-240; however, taking into account the statutory maximum of 240 months' incarceration, the adjusted advisory range would be 235-240 months' incarceration.

only that he had stopped working at Amazon months ago, but that at the time of his arrest, he had been earning money selling crack cocaine. Dkt. 11 at 9. With his crack sales, defendant's criminal acts continued until his arrest in this case. And his repeated violations of Court orders, and his dishonesty with Pretrial Services, show a lack of respect for the law and a serious risk of recidivism. Defendant's involvement with young girls in the commercial sex industry also means that a risk of recidivism comes with it a significant danger to the community.

### 3. Defendant's Acceptance of Responsibility

Defendant pleaded guilty and has accepted responsibility for his crimes, sparing Minor A from having to testify at a trial. The government's recommendation takes into account the mitigating factor of defendant's acceptance and plea.

Despite defendant's acceptance of responsibility, an aggravating factor is that defendant has not filled out certain release forms that the Probation Office repeatedly requested that he complete. PSR ¶ 105. Defendant also did not provide the Probation Office with the required financial information forms so that the Probation Office could determine his assets and income, if any. PSR ¶¶ 158-159. Defendant's failure to fill out the forms and provide information as required so the Probation Office could fully investigate his background indicates that defendant is still not fully accepting responsibility.

### 4. Defendant's History and Family

Defendant faced a number of challenges in his childhood, including the loss of both of his parents when he was only five years old. PSR ¶ 106. Defendant was raised on the west side of Chicago, and reported that he observed a lot of violence in his

16

community. PSR ¶ 108. Defendant also faced housing insecurity when he ran away from home when he was 14 or 15, and was involved in selling drugs to survive. PSR ¶ 112. Defendant's challenges in his childhood are mitigating. However, it is also aggravating that defendant took advantage of the vulnerabilities of a child that faced many of the same struggles: Minor A, living in a DCFS group home without her parents on the west side of Chicago.

Defendant has a long-term partner in Individual G, who continues to be his girlfriend. PSR ¶¶ 115-116. While the support of a long-term partner can be a mitigating factor, in this case, Individual G was also involved in the instant offense. She held Minor A down during a sex act so Minor A could not stop the sex act. Individual G and defendant were engaged in the commercial sex industry together for years.

**5.** ██████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████



### C.    Adequate Deterrence

Another important goal of sentencing is "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  The sentence imposed here should be severe enough to provide for specific deterrence, as set forth above, as well as to deter others from engaging in this type of depraved behavior preying on children.  Human trafficking is fueled by a demand for commercial sex.[7]  Defendant is one of many individuals who profit from selling women and childrens' bodies for sex, with the victims taking all the risk and the pimps keeping most of the profit. A significant sentence of imprisonment in this case will send a message that "pimping" faces serious consequences and will not be tolerated in this district.

In summary, for all of the reasons explained above, the government believes that the factors in this case support a below-Guidelines, but still significant, sentence of 18 years' incarceration.

---

[7] *See* Human Trafficking: Why Trafficking Exists, Nat'l Human Trafficking Res. Ctr., https://traffickingresourcecenter.org/type-trafficking/human-trafficking    (last    visited September 14, 2024) ("Human trafficking is a market-driven criminal industry that is based on the principles of supply and demand, like drugs or arms trafficking.").

## VII.    SPECIAL ASSESSMENT AND FINE

Pursuant to Title 18, United States Code, Section 3014, defendant will be assessed an additional $5,000 per count (total of $10,000) if the Court determines that he is a non-indigent person.

Because defendant did not fill out the required financial disclosure forms, the government cannot take a position on whether defendant is an indigent person. However, the government is not aware of any significant assets or income associated with the defendant. If defendant is ordered to pay the special assessment, by statute, the funds will go to the Domestic Trafficking Victims' Fund, which awards grants and enhances victim programming for victims of trafficking and abuse. *See* 18 U.S.C. § 3104(c) and (e). In other words, the money will be used to fund programs and assistance for victims of offenses like that of the defendant related to child exploitation and trafficking.

The government does not believe a fine is appropriate in this case given that defendant owes restitution to Minor A.

## VIII.   RESTITUTION

Restitution is mandatory under 18 U.S.C. § 3663A and 18 U.S.C. § 2429, in the "full amount of the victim's losses" which includes "the greater of the gross income or value to the defendant of the victim's services, if the services constitute commercial sex acts as defined under section 1591." 18 U.S.C. § 2429(b)(1).

Defendant's restitution order should include repayment of all the funds that defendant kept from the commercial sex acts performed by Minor A. Minor A said

19

that defendant set the rates for "dates", which were $200 for a half an hour, $250 for an hour, and $700 for overnight, if just one girl went on the "date." G.V. Ex. A at 12. If another girl went with Minor A, the cost would be higher.

Minor A's lost income, conservatively calculated, is as follows:

During December 17-18, Minor A estimated that she went on three "dates" – one date the john paid $400; a second date where the john paid $200; and a third date where the john paid an unknown amount. G.V. Ex. A at 7-8. Assuming that third date was the minimum ($200), the total earned during this two-day period was $800, of which defendant gave Minor A approximately $50. *Id.* at 8. Therefore, for the December 17-18 time period, defendant owes to Minor A $750 in restitution.

During the December 19-24 time period (six days), Minor A estimated that she went on five or six "dates" a day except for the day they went to Individual G's house in Wisconsin. *Id.* at 13. Assuming that each "date" was the minimum, $200, and that there were five dates a day, that would be $1,000 per day for the five days (subtracting the day in Wisconsin) for a total of $5,000. This is a conservative estimate because Minor A said that some of the dates were with Individual G, which would have cost the john more than the minimum amount. Defendant only gave Minor A $40 of what she earned, meaning defendant now owes Minor A $4,960 in restitution for the second time period.

Therefore, the total lost earnings to Minor A is $5,710.

Additionally, defendant owes Minor A to any "costs incurred, or that are reasonably projected to be incurred in the future . . . as a proximate result of the

20

offenses involving the victim." 18 U.S.C. § 2259(c)(2). Those costs can include "medical services relating to physical, psychiatric, or psychological care," "physical and occupational therapy or rehabilitation," "temporary housing," and "any other relevant losses incurred by victim." *Id*. The government is in the process of gathering information from Minor A's previous mental health treatment provider and will supplement this memorandum with additional costs relating to Minor A's mental health treatment, as well as other rehabilitative expenses, prior to sentencing.

## IX.    SUPERVISED RELEASE

The government believes that a term of supervised release of at least five years is warranted in this case. The government has no objections to the conditions of supervised release proposed by the Probation Office, save for one proposed change to Discretionary Condition 9. The government recommends that Discretionary Condition 9 be amended to include mental health treatment at the direction of the probation officer. Defendant reports a history of mental health concerns and opined that he could benefit from mental health treatment. PSR ¶¶ 129-131.

## X.    CONCLUSION

For the reasons stated above, the government respectfully requests that this Court impose a sentence of 18 years' incarceration, restitution to Minor A in an amount to be determined by the Court, a $100 special assessment, an additional $10,000 special assessment if the Court deems appropriate, and at least a five-year term of supervised release with the conditions listed above and in the Presentence Investigation Report.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    */s/ Michelle Petersen*
       MICHELLE PETERSEN
       Assistant United States Attorney
       United States Attorney's Office
       219 S. Dearborn Street
       Chicago, Illinois 60604
       (312) 353-5300